UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MARY E PANZIERA,<br><br>    Plaintiff,<br><br>  v.<br><br>NANCY A. BERRYHILL,<br><br>    Defendant. | Case No. 17-CV-02719-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 10, 13 |

   Mary Panziera ("Panziera") appeals the final decision of the Commissioner of Social Security ("the Commissioner") denying Panziera's application for disability insurance benefits under Title II of the Social Security Act and for supplemental security income under Title XVI of the Social Security Act. Before the Court are Panziera's motion for summary judgment, ECF No. 10, and the Commissioner's cross-motion for summary judgment, ECF No. 13. Having considered the parties' briefs, the relevant law, and the record in this case, the Court hereby GRANTS IN PART AND DENIES IN PART Panziera's motion for summary judgment and DENIES the Commissioner's cross-motion for summary judgment.

1

## I.  BACKGROUND

### A.  Panziera's Age, Educational and Vocational Background, and Claimed Disability

Panziera was born in 1959.  AR 45.  She completed two years of college.  AR 225.
Panziera previously worked as an office manager, coffeehouse manager, cafe manager, caterer, and executive assistant.  AR 225, 242.  Panziera stated that she stopped working because of her condition in December 2011.  AR 224.  She alleges a disability onset date of April 4, 2012.  AR 183, 190.  Panziera initially alleged that she is disabled due to epilepsy, acquired hypothyroidism, major depressive disorder, and anxiety.  AR 52, 249, 285.  Later, in an undated appeals form submitted to the Social Security Administration, Panziera alleged that beginning in mid-July 2013, she had an injury to her coccyx (tailbone) that caused her pain, cramping in her calves, and difficulty walking.  AR 286, 288, 313.  Additional facts are discussed as necessary in the analysis.

### B.  Procedural History

Panziera filed an application for disability insurance benefits and supplemental security income in March 2013.  AR 181, 190.  The Commissioner denied Panziera's application initially and on reconsideration.  AR 59, 75, 91, 105.

An ALJ held a hearing on June 9, 2015.  AR 33.  Panziera was represented by an attorney.  AR 33.  Panziera testified at the hearing.  AR 37-43.  No medical expert was called.  An impartial vocational expert ("VE") testified.  AR 35-37.

On July 8, 2015, the ALJ issued a written decision finding that Panziera was not disabled within the meaning of the Social Security Act.  AR 13-25.  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review on March 15, 2017.  AR 1.

On May 11, 2017, Panziera filed a complaint in this Court seeking review of the Commissioner's decision.  ECF No. 1.  On August 11, 2017, the Commissioner filed an answer.  ECF No. 8.  On September 8, 2017, Panziera filed a motion for summary judgment.  ECF No. 10 ("Panziera Mot.").  On November 6, 2017, the Commissioner filed a cross-motion for summary judgment.  ECF No. 13 ("Comm'r Mot.").  On November 20, 2017, Panziera filed a reply.  ECF

No. 14 ("Reply").

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court has the authority to review the Commissioner's decision to deny benefits. 42 U.S.C. § 405(g). The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Cmm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Morgan*, 169 F.3d at 599. "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins*, 466 F.3d at 882).

### B.    Standard for Determining Disability

An individual is considered disabled for the purposes of Title II of the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"ALJs are to apply a five-step sequential review process in determining whether a claimant qualifies as disabled." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009). At step one, the ALJ determines whether the claimant is performing "substantial gainful activity."

United States District Court
Northern District of California

20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two. At step two, the ALJ determines whether the claimant suffers from a severe impairment or combination of impairments that meets the duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If not, the claimant is not disabled. If so, the analysis proceeds to step three. At step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or equals an impairment contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is disabled. If not, the analysis proceeds to step four. At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If so, the claimant is not disabled. If not, the analysis proceeds to step five. At step five, the ALJ determines whether the claimant can perform other jobs in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. If not, the claimant is disabled.

"The burden of proof is on the claimant at steps one through four, but shifts to the Commissioner at step five." *Bray*, 554 F.3d at 1222. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

## III. DISCUSSION

Panziera asserts that the ALJ committed seven errors. First, Panziera argues that the ALJ erred by misweighing the opinions of treating physician Dr. Stephen Saglio and treating neurologist Dr. Stella Legarda. Panziera Mot. at 10. Second, Panziera argues that the ALJ erred by failing to evaluate whether Panziera's seizure conditions met Listing 11.03 at step three. *Id.* at 5-7. Third, Panziera asserts that the ALJ improperly discounted the opinion of therapist Nefertari Rossell. *Id.* at 11. Fourth, Panziera contends that the ALJ erred by purporting to give "great weight" to the opinions of consultative examiners Dr. Manuel Hernandez and Dr. Pauline Bonilla, but failing to adopt significant parts of their opinions. *Id.* at 11-12. Fifth, Panziera argues that the

ALJ improperly discounted the opinion of examining psychologist Dr. Giallo. *Id.* at 11. Sixth, Panziera argues that the ALJ improperly discounted Panziera's subjective symptom testimony. *Id.* at 14. Finally, Panziera asserts that the ALJ failed to pose a complete hypothetical to the VE who testified at the hearing. *Id.* at 15. The Court first summarizes the relevant evidence and the ALJ's opinion, and then the Court assesses whether the ALJ erred.

## A. Relevant Evidence

The Court first summarizes the medical evidence related to Panziera's alleged mental impairments. The Court then reviews the medical evidence related to Panziera's alleged physical impairments. Because Panziera's primary care providers' clinical notes and opinions deal with all of her alleged impairments, the Court discusses this evidence after addressing the mental and physical impairments. The Court then summarizes Panziera's testimony, the third-party evidence from Panziera's sister, and the VE's hearing testimony.

### 1. Depression, Anxiety, and Suicide Attempts

#### a. Community Hospital of the Monterey Peninsula Records

Panziera was admitted to Community Hospital of the Monterey Peninsula on April 4, 2012 after attempting to commit suicide the previous day by overdosing on Tylenol and cutting her wrists. AR 525. The emergency room physician noted that Panziera presented with persistent suicidal ideation and severe depression. AR 525. Panziera's physical examination was generally unremarkable except for superficial cuts on her wrists and blood tests that indicated her hypothyroidism was uncontrolled. AR 524-25.

Panziera was admitted to the hospital for psychiatric observation. AR 526. Panziera relayed that she had insomnia and no appetite. AR 521. Panziera felt "numb and disconnected" and was crying every day "at the drop of a hat." AR 521. Panziera reported feelings of hopelessness and worthlessness. AR 521. Dr. Jill Shannahan, an examining physician, diagnosed Panziera with major depression, severe, without psychosis, and assigned a GAF score of 35. AR 522.

A GAF of 31-40 indicates some impairment in reality testing or communication (speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoiding friends, neglecting family, unable to work).  A GAF of 41-50 indicates serious symptoms (suicidal ideation, severe obsessional rituals[,] frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).  A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  A GAF of 61-70 indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.'  Diagnostic and Statistical Manual of Mental Disorders IV (DSM-IV) 31-34 (4th ed. 2000).

*Denby v. Colvin*, No. 1:15-cv-00191-SB, 2016 WL 917313, at *9 n.6 (D. Or. Mar. 8, 2016).

"[T]he fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (issued May 27, 2013) abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability."  *Id.* at *8 n.5.

Dr. Shannahan prescribed Zoloft to treat Panziera's depression and referred her to therapy and social services.  AR 522.  Panziera was discharged from the hospital on April 6, 2012.  AR 519.  On discharge, Dr. Shannahan noted that Panziera reported feeling better on medication.  AR 520.  In addition, because Panziera had arranged to stay with another family member, she felt more hopeful because she knew she had a place to live.  As a result, Panziera asked to be discharged.  AR 520.  Dr. Shannahan made the following diagnoses on discharge: major depression, severe, without psychosis, and adjustment disorder with mixed emotions and conduct.  AR 519.  Dr. Shannahan assigned a GAF of 60 at discharge.  AR 519.

**b. Examining Therapist Nefertari Rossell, MFTI**

Therapist Nefertari Rossell examined Panziera in September 2012 as part of the intake process into the Monterey County Behavioral Health system.  AR 343-46.  Rossell observed that Panziera presented with a tearful affect.  AR 343.  Rossell recorded the following symptoms: depressed mood, insomnia, loss of energy, feelings of worthlessness, difficulty concentrating, recurrent thoughts of death, and anxiety.  AR 346.  Rossell also observed that Panziera's speech

6

was pressured at times and hyperverbal. AR 347. Panziera explained that she had had trouble sleeping since the 1990s and had been anxious around large groups of people since childhood. AR 343. Rossell noted that Panziera had two previous suicide attempts and that Panziera assessed her likelihood of attempting suicide again was "about a six" out of ten. AR 343. Panziera reported difficulty finding employment during the previous two years. AR 343. Rossell wrote, "she is not working, but there is hope that, with time, she will be able to transition into a job that will be able to support her." AR 346.

Rossell diagnosed Panziera with major depressive disorder, recurrent severe, without psychotic features. AR 346. Rossell assigned a GAF score of 40. However, Rossell also caveated the diagnosis as follows: "It should be noted that the present assessment was limited in time and scope. It is based upon a single, time-limited session." AR 346.

Panziera saw Rossell three more times in September and October 2012 to complete intake paperwork and evaluation. AR 348-50. In late November 2012, Rossell received a voicemail from Panziera stating that Panziera was no longer able to attend therapy because her insurance eligibility had changed and she would be required to pay a co-pay that she could not afford. AR 351.

### c. Examining Psychologist Joseph Giallo, Ed.D.

Licensed clinical psychologist Joseph Giallo examined Panziera once in January 2013. AR 354. Dr. Giallo recorded the following observations from his examination: Panziera's Beck Depression Inventory score was 48, which indicates "extremely severe depression." AR 354. Panziera "[a]ppeared very sad and sullen" and "[c]ried frequently when talking about her suicidal and depression history." AR 354. Panziera stated that she had been unable to find a psychologist or psychiatrist who accepts Medi-Cal in Monterey County. Dr. Giallo provided Panziera with contact information for a psychologist who accepts Medi-Cal and recommended that Panziera contact the psychologist. Dr. Giallo opined that Panziera "currently is too emotionally distraught to perform any work duties." AR 354. Dr. Giallo diagnosed Panziera with depressive disorder not

7

United States District Court
Northern District of California

otherwise specified and generalized anxiety disorder based on her history, recent medical information that Panziera provided, the clinical interview, and the results of the Beck Depression Inventory. AR 354.

### d. Stanford Hospital Records

After Panziera was admitted to the hospital in a coma in April 2013, discussed in more detail in Section III.A.2.b., below, she was placed on an involuntary psychiatric hold after regaining consciousness because of persistent suicidal ideation. AR 396. Specifically, on April 7, 2013, Panziera's treatment team requested a psychiatric consultation because Panziera since regaining consciousness had repeatedly stated that she was mad that she was alive and that she wanted to go home and shoot herself. AR 391. The examining psychiatrist recorded abnormal mental status examination results, including erratic eye contact, restless and writhing movements in the hospital bed, very guarded and irritable attitude, an unusual presence of expletives in Panziera's speech, dysphoric and irritable affect, disorganized and perseverative thought process, suicidal ideation, poor insight, poor judgment, poor attention, and disorientation to date and situation. AR 396. The examining psychiatrist assessed that Panziera's current presentation was complicated by mild agitated delirium characterized by poor attention, fluctuating alertness during the interview, and paranoia. The examining psychiatrist assigned a GAF score of 25. AR 396.

On April 8, 2013, Panziera was more cooperative with her treatment team and Panziera told the examining psychiatrist that she was less confused and thinking much more clearly than she was the previous day. AR 411. Panziera noted that she had experienced auditory and visual hallucinations since being admitted to the hospital but did not describe the hallucinations. AR 411. The examining psychiatrist spoke with Panziera's sister and daughter, both of whom doubted that Panziera's coma resulted from a suicide attempt. AR 411. On mental status examination, the examining psychiatrist observed that Panziera was mostly cooperative but adamant about leaving the hospital as soon as possible. Panziera's speech was slurred and slow. AR 413. Panziera was experiencing psychomotor retardation, "mov[ing] in a slightly drunken fashion." AR 413.

Panziera's affect was euthymic, her thought process was logical, and her insight and judgment were limited. Panziera was oriented, but was unable to spell "world" backward despite repeated attempts and overall was "a bit slow and confused." AR 413. The psychiatrist assessed that Panziera's delirium had resolved, diagnosed depression not otherwise specified, and assigned a GAF score of 35. AR 416.

On April 9, 2013, the examining psychiatrist recorded a normal mental status examination, except that Panziera's insight and judgment were rated as fair and she was assigned a GAF score of 40. AR 429, 431. The psychiatric hold was lifted and Panziera was discharged from the hospital on April 10, 2013. AR 431, 435.

### e. Consultative Examiner Pauline Bonilla, Psy.D.

Consultative examiner Pauline Bonilla, a psychologist, examined Panziera on June 22, 2013. AR 606. Dr. Bonilla did not review the medical records from either of Panziera's hospitalizations. AR 606. Panziera reported that her depression symptoms include sadness, crying episodes, social isolation, a loss of interest in activities, decreased motivation, decreased energy, feelings of hopelessness, helplessness, and worthlessness, and difficulties in memory and concentration. AR 607. Dr. Bonilla observed that Panziera was "dysphoric and crying throughout the entire interview." AR 607. Panziera also reported symptoms of anxiety that mostly occurred in public and crowded places. The anxiety symptoms included shortness of breath, racing heart, chest tightening, muscle tension, shakiness, sweatiness, dizziness, and nausea. AR 607.

On mental status examination, Dr. Bonilla observed that Panziera's "mood appeared to be dysphoric. She was tearful throughout the interview." AR 609. Panziera was able to recall four of four digits forward and backward and was able to recall three of three objects after five minutes. AR 609. Dr. Bonilla opined that Panziera's remote memory appeared to be intact because Panziera recalled her history in detail. Panziera's concentration was within normal limits. Panziera was able to perform a simple three-step command. AR 609. However, Panziera had some difficulty performing simple mathematical calculations and serial threes. AR 609. The

9

mental status examination results were otherwise normal.

Panziera reported that she "is able to complete her adaptive living skills independently, however it takes her extra time." AR 608. Dr. Bonilla noted that Panziera's "social functioning appears to be fair." AR 608.

Dr. Bonilla diagnosed major depressive disorder, adjustment disorder with anxiety, seizures, and hypothyroidism. AR 610. Dr. Bonilla assigned a GAF score of 62. AR 610. Dr. Bonilla opined that Panziera appeared to respond in an honest and open manner and that there was no evidence that Panziera was exaggerating her symptoms. AR 610. Dr. Bonilla also stated that there did not appear to be any inconsistences throughout the interview. Dr. Bonilla opined that Panziera's symptoms appeared to be in the moderate range and the likelihood of Panziera's symptoms improving in the next twelve months with psychotherapy was good. AR 610.

Dr. Bonilla assessed that Panziera had the following limitations:

- Mildly to moderately impaired ability to perform simple and repetitive tasks;
- Mildly impaired ability to accept instruction from a supervisor;
- Mildly to moderately impaired ability to interact with coworkers and the public;
- Mildly impaired ability to sustain an ordinary route without special supervision;
- Mildly to moderately impaired ability to maintain regular attendance;
- Moderately impaired ability to complete a normal workday/workweek without interruptions from a psychiatric condition;
- Moderately impaired ability to deal with stress and changes in the workplace;
- Moderate likelihood of emotionally deteriorating in the workplace.

AR 610-11.

### 2. Epilepsy

#### a. Community Hospital of the Monterey Peninsula Records

On April 2, 2013, Panziera's family found her lying on her side and had a difficult time waking her. They contacted 911, and Panziera was transported to the Community Hospital of the

10

Monterey Peninsula. AR 536. Doctors initially suspected that Panziera had suffered a brainstem stroke, but an MRI the next day was normal. Doctors then observed "what appeared to be seizure activity with pulsatile motions, predominantly of her face and mouth. She underwent an EEG that also had suspicion for underlying seizure activity." AR 536. Panziera's seizure activity grew more obvious on April 4, 2013, despite being on several seizure medications. The seizures came under control with intermittent dosing of Ativan. Panziera was then transferred to Stanford Hospital's neurointensive care unit on April 4, 2013. AR 536.

### b. Stanford Hospital Neurology Records

As discussed above in Sections III.A.1.d. and III.A.2.a., Panziera was non-responsive upon her admission to Stanford on April 4, 2013. AR 361. The Stanford doctors considered a range of possible causes of her coma, including an overdose, encephalitis, status epilepticus, and prolonged hypoglycemia. AR 361, 363. The Stanford doctors also considered the possibility that Panziera's coma might be continuing due to the high dose of midazolam, a type of the benzodiazepine class of sedatives, that Panziera received at the Community Hospital of the Monterey Peninsula. *See* AR 369-70. Doctors observed abnormal EEG activity that they assessed was most frequently associated with metabolic disturbance, particularly liver dysfunction. AR 372.

Panziera began to regain consciousness on April 6, 2013. AR 378-79. She continued to progress toward consciousness on April 7, 2013. AR 385, 388, 390. By the night of April 7, 2013, Panziera was awake and tried to climb out of bed and to pull out her IV lines. AR 391. Panziera denied that she had tried to commit suicide and denied taking any medications before the coma. AR 398. Despite her denials, by April 8, 2017, the Stanford doctors noted that they strongly suspected an overdose, whether intentional or unintentional, as the cause of Panziera's initial unresponsiveness because there was no evidence of other causes, including seizures, infection, or "other neurologic insult." AR 399, 420. Because Panziera had not had seizures for more than thirty years, the doctors strongly doubted that her coma was caused by status epilepticus. AR 399.

On April 9, 2013, Panziera reported to a Stanford occupational therapist that she was independent with activities of daily living, including buying her own groceries and cooking for herself. Panziera stated that she spent most of her days cleaning. Panziera also stated that she drives herself. The occupational therapist noted that it was "[u]nclear how reliable of a historian [patient] is," AR 422, and the Court notes that around that same time Panziera inaccurately reported her medical history to other hospital staff, *see* AR 427 (denying previous suicide attempts).

Panziera was discharged from Stanford Hospital on April 10, 2013. AR 435. The discharge notes reflect the Stanford doctors' continued uncertainty about the cause of Panziera's coma:

> Her suspicion for seizure was low on presentation, and her abnormal motor movements were thought to represent myoclonus in the setting of possible ingestion. With an extensive workup ruling out CVA and status epilepticus, the exact etiology of her AMS is unknown. She had no other signs [of] metabolic derangement or infection. It appears from her clinical picture that there was possibly an occult ingestion, or a metabolic derangement that has cleared completely, in addition to oversedation by [Community Hospital of the Monterey Peninsula] leading to a toxic encephalopathy.

AR 436.

### c. Treating Neurologist M. Stella Legarda, M.D.

Dr. M. Stella Legarda, a neurologist, treated Panziera for epilepsy beginning in April 2014. AR 634. Panziera reported to Dr. Legarda that Panziera's first seizure was at age nine. AR 634. Panziera took phenobarbital for six months. Panziera had another seizure at age thirteen and then stayed on phenobarbital until the age of twenty-two. During that time period, Panziera had five grand mal seizures. AR 634. Panziera also had seizures at the ages of twenty-seven and thirty-one. At the age of fifty, Panziera started having dizzy spells. Panziera reported "experience[ing] almost a [transient ischemic attack] type seizure" in about 2010. AR 634. Panziera reported that EEGs have not detected any abnormal brain activity. Panziera knows when a seizure is coming because she experiences "a seasickness in her brain," "like a wave of dizziness." AR 634. Panziera reported that she was experiencing about two to three seizures per week. Panziera also

12

reported episodes of transient global amnesia.  AR 634.

On physical examination in April 2014, Dr. Legarda noted "mild Romberg," which signifies a problem with balance.  AR 636.  The examination results otherwise appeared to be normal.  Dr. Legarda diagnosed Panziera with complex partial epilepsy, generalized convulsive epilepsy, and depression.  AR 636.

In May 2014, Dr. Legarda reviewed Panziera's EEG results and concluded that they were normal.  AR 628.  The results of a neurological physical exam were normal.  AR 629.  Dr. Legarda referred Panziera to Dr. Theodore Kaczmar for a vagus nerve stimulation device placement.  AR 630-631.  Two weeks after Dr. Kaczmar implanted the stimulator, which is discussed in more detail in the next section, Panziera reported to Dr. Legarda that Panziera "has not felt 'seizur-y' since the surgery."  AR 624.

On October 17, 2014, Dr. Legarda filled out a medical source statement related to Panziera's epilepsy.  AR 659-62.  Dr. Legarda opined that Panziera has nonconvulsive seizures during which she loses consciousness or has altered awareness.  AR 659.  Dr. Legarda wrote that Panziera had two to three seizures per week before the vagus nerve stimulator implant, and about two to three seizures per month after the stimulator implant.  AR 659.  Dr. Legarda described Panziera's typical seizure as beginning with an aura that was like a feeling of seasickness, followed by a wave of severe dizziness.  Dr. Legarda noted that Panziera also has global amnesia and that her seizures are provoked by lights.  AR 659.  Dr. Legarda reported that Panziera experienced confusion, severe headaches, irritability, exhaustion, and difficulties communicating for one to two days after a seizure.  AR 660.  As a result, Panziera typically sleeps for long periods after a seizure.  Dr. Legarda opined that stress could precipitate Panziera's seizures, and that as a result Panziera was incapable of even low-stress work.  AR 660.  Dr. Legarda opined that Panziera could never carry more than ten pounds, but did not explain the cause of this limitation.  AR 661.

Dr. Legarda also opined that Panziera would need to take unscheduled breaks during an eight-hour workday when she was "stressed by light or anxiety," but Dr. Legarda did not specify

United States District Court
Northern District of California

how frequently such breaks would be needed. AR 662. Dr. Legarda opined that Panziera would

likely be absent from work more than four days per month due to her epilepsy. AR 662.

### d. Treating Neurosurgeon Theodore Kaczmar, M.D.

As discussed in the previous section, Dr. Legarda referred Panziera to Dr. Theodore

Kaczmar, a neurosurgeon, in May 2014 for evaluation of Panziera's epilepsy and Dr. Legarda's

recommendation of a vagus nerve stimulator implantation. AR 683. Panziera reported that her

seizures had increased in frequency since the incident in April 2013, which Dr. Kaczmar

characterized in his notes as status epilepticus. AR 683. Panziera reported that her last seizure

was one week prior to seeing Dr. Kaczmar. AR 683. She reported that she nearly always has

auras with her seizures. AR 683. Dr. Kaczmar diagnosed Panziera with intractable epilepsy and

recommended that she proceed with the nerve stimulator implantation. AR 685.

Dr. Kaczmar performed the vagus nerve stimulator implantation on June 25, 2014. AR

688. Panziera had a follow-up appointment with Dr. Kaczmar on July 14, 2014. AR 687.

Panziera told Dr. Kaczmar that since the surgery, she had had one minor seizure "characterized as

a dizzy spell" and that she was "able to use the magnet which cleared her seizure very quickly."

AR 687. Dr. Kaczmar opined that Panziera "is experiencing excellent clinical results with her

recent operation." AR 687.

### 3. Lower Back Pain

#### a. Examining Physicians Patrick Wong, M.D. and Theodore Kaczmar, M.D.

Dr. Patrick Wong of Monterey Spine & Joint first saw Panziera in April 2014 for "coccyx

pain radiating to both hips and bilateral calf[] cramping." AR 614. Panziera reported to Dr. Wong

that these symptoms had existed for about a year, were intermittent, were made worse by weight

bearing, and were alleviated with rest and ibuprofen. Panziera stated that her symptoms were

associated with poor walking endurance. AR 614. Panziera rated the pain an 8 out of 10 in

severity.

On physical examination, Dr. Wong observed that Panziera's sensation was intact

United States District Court
Northern District of California

bilaterally, that Panziera's gait was normal, and that Panziera had a full range of motion in her spine and hips. AR 615-16. Panziera had no tenderness to palpation of the lumbar paraspinal muscles, percussion of the lumbar spine, palpation of the lumbar spinous processes, and palpation of the SI joint bilaterally. Panziera was tender to palpation of the tailbone. AR 615. Dr. Wong took x-rays of the lumbar spine. Based in part on these x-rays, he diagnosed degenerative disc disease of the lumbar spine, lumbar spinal stenosis, lumbar radiculopathy, and coccygodynia. AR 616. Dr. Wong prescribed Panziera voltaren gel for pain and referred Panziera to physical therapy for lumbar stabilization. AR 616.

Panziera saw Dr. Kaczmar on April 30, 2015 to get a second opinion on her coccyx pain. AR 680. At this point, Panziera described the pain as severe tailbone and lower back pain that radiates to her thighs. She said the symptoms had been present for two years but had worsened in the last two weeks. Panziera described the pain as constant and rated it a 10 out of 10 in severity. AR 680. Panziera stated that the symptoms are made worse by physical activity and prolonged walking. Her calves cramped if she walks more than ten steps. AR 680. Dr. Kaczmar noted that "the patient reports continued pain in spite of care." AR 680. Panziera also reported pain and numbness radiating down the legs. Dr. Kaczmar observed a normal gait, normal sensation to touch, and normal range of motion. AR 681. Dr. Kaczmar assessed that Panziera's neurologic examination was normal and referred her back to Dr. Wong for treatment of her back pain. AR 682.

Panziera returned to see Dr. Wong in May 2015. Panziera was apparently unable to complete the physical therapy because of "financial issues related to transportation." AR 682; *accord* AR 698. She also did not pick up the voltaren gel that Dr. Wong had previously prescribed. AR 698. Panziera described symptoms of tailbone pain radiating to the calves. She said the pain was now constant and was made worse by weight bearing, prolonged sitting, and daily activities. AR 698. Panziera rated the pain a 7 out of 10. AR 698. Dr. Wong's physical examination revealed the same findings as the April 2014 visit. Specifically, Dr. Wong observed

Case No. 17-CV-02719-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

a normal gait, normal range of motion, and no tenderness to palpation except at the tailbone.  AR 699.  Dr. Wong prescribed two types of pain relievers and suggested that Panziera return if she wanted to try a local cortisone injection.  AR 700.

### b. Examining Physician Manuel Hernandez, M.D.

Dr. Manuel Hernandez, a consultative examiner, examined Panziera on August 9, 2014.  AR 646.  Panziera reported to Dr. Hernandez that since having the nerve stimulator implanted on March 18, 2014, her seizures occur every seven to ten days.  AR 646-47.  Panziera reported that her last seizure occurred three days before seeing Dr. Hernandez.  AR 647.  Panziera told Dr. Hernandez that she has lower back pain and she rated the pain a four out of ten.  AR 647.  She said the pain does not radiate down her legs.  AR 647.  Panziera stated that she is independent in her activities of daily living, although she has some trouble standing, walking, sitting, and lifting, and she also has difficulty dealing with the public because of her anxiety and depression.  AR 647.

Dr. Hernandez noted that the "findings on physical examination are based both on formal testing as well as [his] observations of the claimant's spontaneous actions."  AR 648.  Relevant here, Dr. Hernandez observed no tenderness to palpation of the midline paraspinal area, a normal range of motion of the cervical and thoracolumbar spine, and a negative straight leg raise test.  AR 648, 650.  Dr. Hernandez observed normal range of motion and normal strength of Panziera's upper and lower extremities.  AR 649.  Panziera's gait was within normal limits.  AR 649.

Based on the formal testing and observation of Panziera, Dr. Hernandez assessed that Panziera should be limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds.  AR 650.  "She can stand and/or walk with normal breaks for about two hours in an eight-hour workday.  She can sit with normal breaks for about six hours in an eight-hour workday."  AR 650.  Dr. Hernandez also assessed the following seizure-related limitations: avoiding odors, avoiding extremes of temperature, avoiding stress, avoiding any magnetic devices, and avoiding hazardous machinery and heights.  AR 650.

16

### 4. Treating Primary Care Physician Stephen Saglio, M.D. and Treating Physician's Assistant Brenda Saglio

Panziera's primary care providers since about 2009 were Dr. Stephen Saglio and Physician's Assistant ("PA") Brenda Saglio. AR 665. As primary care providers, Dr. and PA Saglio's records address all of Panziera's impairments. In August 2012, Dr. Saglio filled out a state disability certificate in which he noted diagnoses of depression, anxiety, and acquired hypothyroidism. AR 324-25. Dr. Saglio wrote that these conditions cause Panziera extreme fatigue, emotional lability, and difficulty concentrating. AR 324. Dr. Saglio estimated that Panziera would be able to return to work by October 2012. AR 324. Dr. Saglio then filled out supplementary certificates in October 2012, December 2012, and January 2013. AR 329, 331, 335.

The record only contains four treatment notes from Dr. Saglio and PA Saglio. PA Saglio saw Panziera in February 2014. AR 678-79. Panziera reported at that time that she had been diagnosed with "absence seizures." AR 678. Panziera's physical and mental examinations were normal except that PA Saglio recorded that Panziera exhibited a depressed mood, a tearful affect, and only fair judgment. AR 679. Panziera returned for a follow-up appointment with PA Saglio in October 2014. During that appointment, PA Saglio observed Panziera use the vagus nerve stimulator to prevent a seizure that was provoked by fluorescent lighting. AR 676. Panziera reported that she was experiencing severe depression with "more bad than good days." AR 676. Panziera stated that she often does not leave her home. Panziera reported that this episode of depression had been present for ten to twelve months. AR 676. Panziera's symptoms included anhedonia, anxious mood, altered sleep habits, crying spells, decreased ability to concentrate, fatigue, sadness, feelings of worthlessness, and fleeting thoughts of suicide. AR 676. On physical examination, PA Saglio observed that Panziera had a normal gait and normal tone and strength in all major muscle groups. AR 677. However, PA Saglio observed a decreased range of motion with neck lateral flexion, pain with neck extension, lateral flexion, and rotation, and a decreased range of motion with bilateral shoulder external rotation. AR 677. On mental status examination,

United States District Court
Northern District of California

PA Saglio reported that Panziera had an anxious mood, intact orientation, intact memory, and fair insight and judgment. AR 677.

PA Saglio saw Panziera again in January 2015. AR 674. Panziera reported experiencing anxiety, crying spells, and depression. AR 674. Finally, Dr. Saglio saw Panziera in April 2015. AR 671. Panziera reported continued symptoms of depression and anxiety, including crying spells, depression, feelings of stress, anhedonia, difficulty concentrating, and sleep disturbance. Panziera requested a referral to a pain specialist. AR 671. Dr. Saglio diagnosed depressive disorder not otherwise specified, acquired hypothyroidism, generalized anxiety, chronic low back pain, and hypertension. AR 672. Dr. Saglio initiated a referral to a psychologist for evaluation of Panziera's depression, but there is no indication from the record whether Panziera pursued that referral. AR 673. Dr. Saglio also initiated a referral to an orthopedist and pain specialist to assess Panziera's back pain. AR 673.

On October 30, 2014, PA and Dr. Saglio filled out a medical source statement. They noted that Panziera was diagnosed with hypothyroid, depression, anxiety, seizure disorder, and "DJD," which they did not define. AR 665. They noted that Panziera's symptoms were fatigue and chronic back pain and recorded clinical findings of slowed gait, decreased range of motion, and poor concentration. AR 665. PA and Dr. Saglio estimated that Panziera could walk one city block without severe pain, could sit for twenty minutes at a time and stand for fifteen minutes at a time. AR 666. They estimated she could sit for less than two hours total per day and stand/walk for less than two hours per day. AR 666. They opined that "[patient] cannot function to work, [due to] poor concentration, social anxiety, and decreased cognitive function." AR 666. PA and Dr. Saglio opined that Panziera could occasionally carry less than ten pounds and never carry more than ten pounds. AR 667. She could rarely twist, stoop, or crouch and could never climb stairs or ladders. AR 667. PA and Dr. Saglio opined that Panziera's symptoms would be severe enough to interfere with even simple work tasks 50% or more of the time and that she would be absent more than four days per month due to her impairments. AR 668.

### 5. Panziera's Testimony

On May 1, 2013, Panziera filled out a function report.  AR 249-57.  Panziera stated that she is unable to drive or spend extended periods of time in fluorescent light or daylight due to seizures.  AR 249-50.  She said that she mostly stays at home during the day and only goes outside at night.  AR 250.  Panziera reported that on good days, she can do some light housework, such as doing the dishes, but on bad days she cries and sleeps.  AR 250-51.  Panziera reported no problems with her personal care, except that she sometimes does not eat for days if someone else does not encourage her to eat.  AR 250.  Panziera stated that she can prepare cereal, canned soup, or simple meals, but she noted that this is a significant contrast with her previous work as a gourmet caterer.  AR 251.

Panziera stated that she watches television all day long and no longer is interested in her former hobbies, such as cooking, baking, gardening, and reading.  AR 253.  Panziera stated that she does not spend time with others, that seeing her family "puts [her] in deep depression," and that she no longer does any social activities or volunteering.  AR 253-54.  Panziera reported that her depression and seizures affect her concentration, and she estimated that she could pay attention for five to ten minutes at a time and could not retain spoken instructions.  AR 254.  Panziera estimated that she could walk for about 150 paces before needing to rest for fifteen to twenty minutes.  AR 254.  She stated that she was not currently taking any medication for her illnesses.  AR 256.

Panziera also testified at the hearing before the ALJ on June 9, 2015.  AR 37.  Panziera testified that when she has a seizure with an aura she can stop it using the nerve stimulator, but she has also been "having seizures that include transient amnesia, and that happens just out of the blue."  AR 39.  When Panziera has a seizure with transient amnesia, she "black[s] out—blank[s] out."  AR 39.  After the seizure, Panziera stated that she is very disoriented, very tired, emotionally distraught, and unusually confused.  AR 41.  It takes between three hours and a day to physically recover from the seizure.  AR 41.  Emotionally, Panziera "drop[s] into a deep

19

Case No. 17-CV-02719-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

depression" after a seizure for two days or more. AR 41. When asked by her attorney about the frequency of her seizures over the previous two years, Panziera said that "over the last two years it can be three to six times a week." AR 41. She said that the last time she had to use the magnet to prevent a seizure was that day in the waiting room before the hearing. AR 41.

Panziera stated that she has trouble standing, walking, or lifting because "the last three discs in [her] spine are sort of curling in on one another." AR 39-40. She estimated that she could sit for fifteen to twenty minutes at a time. AR 40. Panziera also stated that she has trouble dealing with people, and that she had a breakdown at her last job as a coffeehouse manager. AR 40. She said, "If I could find something that I could do at home I would be happy to do that." AR 40.

### 6. Lay Witness Statement of Panziera's Sister, Mia Meeks

On May 5, 2013, Mia Meeks, Panziera's sister, filled out a third party function report. AR 233. Meeks stated that Panziera does not drive or go to stores with fluorescent lighting due to the threat of seizures. AR 233. Meeks reported that Panziera wears sunglasses during the day due to photosensitivity. AR 233. Because daylight can cause Panziera to be dizzy, Panziera only leaves the house when necessary. AR 236

Meeks said that on some days Panziera cannot get out of bed due to depression and that Panziera "is subject to bouts of crying." AR 233. Meeks reported that Panziera has no problems with personal care other than sometimes needing a reminder to eat. AR 234. During the day, Panziera watches television, reads, and does light housework, such as dusting, some vacuuming, sweeping, and folding laundry. AR 235-35. Panziera also plays card games and board games. AR 237. Panziera also feeds her cat and does some cooking. AR 234. However, Meeks clarified that Panziera does not use the stove without supervision apparently because Panziera is afraid of forgetting to turn it off. AR 235. Panziera also has trouble remembering recipes. AR 235.

Panziera sees her daughter about once per week, AR 237, although Meeks reported that Panziera gets very sad when she visits other family and so Panziera no longer attends family functions, AR 238. Meeks stated that Panziera does not see any friends or "socialize at all

20

anymore." AR 238.

Meeks estimated that Panziera could pay attention for about twenty minutes at a time and could walk for about twenty yards before needing a fifteen-minute rest. AR 238. Meeks observed that Panziera often needs to read instructions repeatedly or have instructions repeated once or twice before she can follow them. AR 238. Meeks stated that Panziera becomes anxious and agitated when exposed to crowds, noise, or excessive light. AR 239. Panziera can also become suicidal if she is too stressed. AR 239.

### 7. VE Testimony

A vocational expert, Victoria Hyatt, testified at the hearing before the ALJ. AR 36. Hyatt testified that if Panziera was limited to simple and repetitive tasks, Panziera would not be able to perform her past relevant work. AR 36. The ALJ asked Hyatt whether there would be jobs available to a person with Panziera's age, education, and past work experience who was limited to light work with no exposure to heights or machinery and who was limited to simple, repetitive work. AR 36. Hyatt testified that jobs such as office helper and mail sorter would be available to someone with such restrictions. AR 36-37. The ALJ then asked Hyatt whether a person with the same age, education, and work experience who could sit no more than two hours total and no more than twenty minutes at a time, and stand and walk no more than two hours and no more than fifteen minutes at a time would be precluded from all work. AR 37. Hyatt responded that such a person would be precluded from all work. AR 37.

## B. The ALJ's Opinion

The ALJ filed a written decision denying Panziera's claim on July 8, 2015. AR 25. The ALJ applied the five-step evaluation process for determining disability described in 20 C.F.R. § 404.1520. At step one, the ALJ found that Panziera had not engaged in substantial gainful activity since April 4, 2012. AR 15. At step two, the ALJ found that Panziera had the following severe impairments: seizures, hypothyroidism, low back pain, anxiety, and depression. AR 15.

At step three, the ALJ found that none of Panziera's impairments or combination of

21

impairments met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 23-16. Specifically, although the ALJ did not offer any elaboration, the ALJ found that Panziera's physical impairments did not "meet or medically equal the severity requirements of [L]isting[] 11.03," which at the time of the ALJ's decision was the Listing for nonconvulsive epilepsy. AR 16. The ALJ also considered Listing 12.04, for affective disorders, and Listing 12.06, for anxiety disorders. AR 16. Specifically, the ALJ found that Panziera did not meet the "B criteria" for Listing 12.04 or 12.06 because Panziera had no restriction in activities of daily living, mild difficulty in social functioning, and moderate difficulty in concentration, persistence, or pace. AR 16. The ALJ also found that Panziera had not experienced any episodes of decompensation of an extended duration. AR 17.

Before moving to step four, the ALJ assessed that Panziera had the residual functional capacity to perform medium work, except that she was limited to simple and repetitive tasks and could not work around heights or machinery. AR 17. In coming to this RFC, the ALJ summarized and weighed the medical evidence and Panziera's subjective symptom testimony. AR 18-23. The ALJ assigned little weight to Ms. Rossell's opinion "as she is not an acceptable medical source." AR 19. The ALJ assigned no weight to the opinions of Dr. Saglio and Dr. Giallo that Panziera was unable to work because the ultimate issue of disability is reserved for the Commissioner. AR 19. The ALJ assigned great weight to Dr. Bonilla's opinion because "she based her opinions on the clinical findings from her examination." The ALJ also noted that Dr. Bonilla "is a licensed psychologist," which gives her "a perspective not shared by other physicians of record." In addition, the ALJ observed that Dr. Bonilla's opinion "is the only mental medical source statement in the record." AR 19. The ALJ explicitly adopted the RFC's limitation to simple, repetitive tasks in reliance on Dr. Bonilla's finding that Panziera was moderately limited in maintaining concentration, persistence, or pace. AR 19.

The ALJ gave little weight to Dr. Legarda's opinion because it "is a check-off report that does not contain any explanation of the bases of her conclusions." AR 21. Specifically, the ALJ

22

wrote that "Dr. Legarda does not support her medical source statement with a narrative, objective medical evidence or treatment records, so the undersigned is unable to evaluate the validity and accuracy of Dr. Legarda's opinion." AR 21. The ALJ also found that Dr. Legarda's opinion was inconsistent with the record. AR 21.

The ALJ gave little weight to Dr. Wong's diagnoses of lumbar spinal stenosis, lumbar radiculopathy, and coccygodynia because "there is no objective evidence to support these findings." AR 21. Specifically, the ALJ observed that "[t]he x-ray interpretations were not included with the record, so there is no evidence revealing nerve impingement at the L5-S1 level or spinal stenosis. There is no radiographic evidence revealed an injury [sic] to the claimant's tailbone." AR 21. Additionally, the ALJ found the diagnoses inconsistent with Panziera's statements to other doctors in which she said the pain did not radiate into her legs. AR 21.

The ALJ gave great weight to the opinion of consultative examiner Dr. Hernandez because Dr. Hernandez supported his opinion with clinical findings from his examination. AR 22. The ALJ also observed that Dr. Hernandez "is board-eligible in internal medicine," and his training provides him with a perspective not shared by other physicians of record. AR 22. However, the ALJ concluded that Dr. Hernandez's assessment that Panziera should be limited to light work was not supported by the clinical findings. AR 22.

The ALJ gave little weight to Dr. Saglio's opinion because his statement "is a check-off report that does not contain any explanation of the bases of his conclusions." AR 23. In addition, "Dr. Saglio is not a specialist in mental health, so the [ALJ] accord[ed] little weight to Dr. Saglio's opinion that the claimant cannot work due to poor concentration, social anxiety and decrease in cognitive functions." AR 23. The ALJ also wrote that "Dr. Saglio provides no basis why the claimant would be off task more than 50% due to attention and concentration issues." Finally, the ALJ found that Dr. Saglio's sit and stand/walk restrictions were not supported by the medical record. AR 23.

The ALJ found Panziera's subjective symptom testimony not fully credible because the

ALJ thought it was contradicted by the medical record. AR 18-23. Finally, the ALJ gave little weight to the third-party function report submitted by Panziera's sister, Ms. Meeks, because "it represents the non-medically trained observations of an understandably concerned and sympathetic family member." AR 23. In addition, the ALJ found Meeks' statement that Panziera sees her daughter once per week inconsistent with Panziera's statement that she does not spend time with others. AR 23.

At step four, the ALJ found that Panziera is unable to perform her past relevant work. AR 23-24. At step five, the ALJ found that, considering Panziera's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Panziera could perform. AR 24. In coming to this conclusion, the ALJ relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("the Grids"). AR 24. The ALJ did not cite the VE's testimony at step five. Rather, the ALJ concluded that if Panziera had the capacity to perform the full range of medium work, the Grids would direct a finding of "not disabled." AR 24. Because Panziera's "additional limitations have little or no effect on the occupational base of unskilled medium work," the ALJ concluded that Panziera is not disabled. AR 24-25.

## C.     Analysis

As stated above, Panziera argues that the ALJ committed six errors. The Court addresses these asserted errors in turn.

### 1. Error in Weighing Treating Physicians' Opinions

First, Panziera argues that the ALJ erred by misweighing the opinions of treating physician Dr. Stephen Saglio and treating neurologist Dr. Stella Legarda. Panziera Mot. at 10. "Generally, the opinion of a treating physician must be given more weight than the opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528

F.3d 1194, 1198 (9th Cir. 2008) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). To reject a treating or examining physician's contradicted opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence." *Id.* (quoting *Bayliss*, 427 F.3d at 1216). Even when a treating physician's opinion is contradicted, and thus not entitled to controlling weight, "in many cases" it will still "be entitled to the greatest weight and should be adopted." *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)).

Aside from summarizing the law on weighing treating physicians' opinions, Panziera offers little explanation as to how she believes that the ALJ erred with respect to the opinions of Drs. Saglio and Legarda. *See* Panziera Mot. at 8-10. With regard to Dr. Saglio, Panziera contends that Dr. Saglio treated Panziera for about five years. Panziera summarized Dr. Saglio's opinion as limiting Panziera to less than sedentary work because of her lumbar spine degeneration, depression, anxiety, and seizure disorder. *Id.* at 10. With regard to Dr. Legarda, Panziera argues that Dr. Legarda's opinion also limited Panziera to less-than-sedentary work. *Id.* Panziera argues that because of the clarity of these treating physicians' findings and opinions, as well as their consistency with other unspecified medical opinions, Dr. Saglio's and Dr. Legarda's opinions should be given controlling weight. Panziera does not address the reasons that the ALJ gave for discounting either Dr. Saglio's or Dr. Legarda's opinions.

As discussed above, the ALJ afforded little weight to Dr. Saglio's opinion because his statement "is a check-off report that does not contain any explanation of the bases of his conclusions." AR 23. In addition, "Dr. Saglio is not a specialist in mental health, so the [ALJ] accord[ed] little weight to Dr. Saglio's opinion that the claimant cannot work due to poor concentration, social anxiety and decrease in cognitive functions." AR 23. The ALJ also wrote that "Dr. Saglio provides no basis why the claimant would be off task more than 50% due to attention and concentration issues." Finally, the ALJ found that Dr. Saglio's sit and stand/walk restrictions were not supported by the medical record. AR 23.

United States District Court
Northern District of California

The ALJ gave little weight to Dr. Legarda's opinion because it "is a check-off report that does not contain any explanation of the bases of her conclusions." AR 21. Specifically, the ALJ wrote that "Dr. Legarda does not support her medical source statement with a narrative, objective medical evidence or treatment records, so the undersigned is unable to evaluate the validity and accuracy of Dr. Legarda's opinion." AR 21. The ALJ also found that Dr. Legarda's opinion was inconsistent with the record. AR 21.

The ALJ did not err by discounting the opinions of Dr. Saglio and Dr. Legarda. The fact that a medical source offers an opinion by filling out a check-box questionnaire is not necessarily a specific and legitimate reason to discount that opinion. *See Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017); *Garrison v. Colvin*, 759 F.3d 995, 1013 (9th Cir. 2014). This is particularly true where the ALJ has access to the medical source's treatment records and those records are consistent with the medical source's opinion. *See Popa*, 872 F.3d at 907; *Garrison*, 759 F.3d at 1013. However, "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (internal citations omitted). Similarly, "[a] conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim*, 763 F.3d at 1161. Here, although the administrative record did contain treatment notes from both doctors, those notes did not support the severity of the limitations assessed by Dr. Saglio or Dr. Legarda.

For example, Dr. Saglio opined that Panziera could not sit more than two hours per day, could not stand/walk more than two hours per day, could not ever carry more than ten pounds, and could only rarely twist, stoop, or crouch. But aside from noting a diagnosis of chronic lower back pain and a referral to an orthopedist, AR 672-73, Dr. Saglio's notes do not contain any indication that Panziera's back pain is so severe as to limit her to less than sedentary work. In April 2015, Dr. Saglio noted that Panziera's gait was normal and that her neck had a full range of motion. AR

26

672.  The treatment note from January 2015 does not mention lower back pain.  AR 674.  In October 2014, PA Saglio observed a decreased range of motion in Panziera's neck and shoulders but observed a normal gait and normal tone and strength in all major muscle groups.  The October 2014 treatment note does not mention lower back pain.  AR 677.  The February 2014 treatment note reflects a normal gait, grossly normal muscle tone and strength, and no pain with range of motion.  AR 679.  It does not mention lower back pain.  AR 679.

Similarly, Dr. Saglio opined that Panziera would be off-task more than 50% of the day.  Although Dr. Saglio's treatment notes reflect Panziera's symptoms of depression, including Panziera's self-reports of concentration difficulties, the treatment notes do not support such an extreme limitation.  *See* AR 671, 676, 679.  As a result, the ALJ's conclusion that Dr. Saglio's opinion was not supported by the medical records was a specific and legitimate reason supported by substantial evidence.  The Court need not reach the validity of the ALJ's other reasons for discounting Dr. Saglio's opinion.

Likewise, Dr. Legarda's treatment notes do not support the extent of the limitations in Dr. Legarda's opinion.  Specifically, Dr. Legarda opined that Panziera would miss more than four days of work per month, presumably because Panziera requires a day or more to recover after a seizure.  AR 660.  Dr. Legarda stated that Panziera's postictal symptoms included confusion, severe headaches, irritability, exhaustion, and difficulties communicating.  However, Dr. Legarda's treatment notes reflect no such symptoms.  In fact, the record supports the opposite conclusion: that Panziera's vagus nerve stimulator allowed her to prevent or drastically reduce the severity of her seizures and that she could continue functioning after using the stimulator to prevent or shorten the seizure.  In July 2014, Panziera told Dr. Kaczmar that since receiving the stimulator, she had had one minor seizure "characterized as a dizzy spell" and that she was "able to use the magnet which cleared her seizure very quickly."  AR 687.  Dr. Kaczmar opined that Panziera "is experiencing excellent clinical results with her recent operation."  AR 687.  In October 2014, PA Saglio observed Panziera use the stimulator to prevent a seizure provoked by

the office's fluorescent lighting.  AR 676.  The treatment notes from that visit do not show any of the postictal effects that Dr. Legarda's opinion describes.  Finally, Panziera testified at the hearing that she used the stimulator in the waiting room before the hearing to prevent a seizure, yet she was able to testify thereafter.  AR 41.  To the extent that Dr. Legarda was referring to Panziera's allegations of transient amnesia that occur without warning, the ALJ is correct that the record contains no objective medical evidence to support these allegations.  As such, the ALJ did not err by discounting Dr. Legarda's opinion.

### 2.  Failure to Properly Evaluate Listing 11.03 for Epilepsy

Second, Panziera argues that the ALJ erred by failing to evaluate whether Panziera's epilepsy met or equaled Listing 11.03 at step three.  Panziera Mot. at 5-7.  At the time of the ALJ's decision, Listing 11.03 covered nonconvulsive epilepsy (petit mal, psychomotor, or focal).  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03.  Listing 11.03 required documentation "by detailed description of a typical seizure pattern, including all associated phenomena."  *Id.*  The seizures must occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment."  *Id.*  The Listing also required "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day."  *Id.*

In addition, the introductory note to the neurological Listings states that "[i]n epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures.  At least one detailed description of a typical seizure is required."  *Id.* at § 11.00.A.  "The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information.  Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available."  *Id.*  The introductory note also states that "the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment."  *Id.*

28

"An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001). In *Lewis*, the ALJ found that the claimant's mild mental retardation and seizure disorder in combination were severe. *Id.* at 512. The ALJ also found that the claimant "does not have an impairment or combination of impairments listed in or medically equal to one listed in the regulations." *Id.* The claimant challenged the ALJ's decision by arguing that the ALJ did not sufficiently explain the conclusion that the claimant's impairments did not meet or medically equal a Listing. *Id.* The Ninth Circuit rejected this argument. *Id.* at 513. Specifically, the Ninth Circuit observed that although the ALJ did not make specific findings about the nature or frequency of the claimant's seizures in the "Findings" section of the written opinion, the ALJ did discuss evidence that the claimant was not compliant with prescribed treatment in the "Statement of the Case" section of the written opinion. *Id.* The Ninth Circuit held that its precedent "simply requires an ALJ to discuss and evaluate the evidence that supports his or her conclusion; it does not specify that the ALJ must do so under the heading 'Findings.'" *Id.*; *see also Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013) (same).

With regard to equaling a Listing, the United States Supreme Court has held that "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Kennedy*, 738 F.3d at 1176 (quoting *Sullivan v. Zebley*, 493 U.S. 421, 531 (1990)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530. In addition, an ALJ does not err by failing to address whether the claimant's combination of impairments medically equals a Listing where the claimant offers no plausible theory as to how her impairments equal any Listing. *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005); *Lewis*, 236 F.3d at 514.

29

1   Here, Panziera argues that the ALJ committed two errors related to the ALJ's evaluation of

2   Listing 11.03. First, Panziera argues that the ALJ erred by failing to assess whether Panziera met

3   Listing 11.03 for a closed period beginning on her alleged onset date of April 4, 2012, and ending

4   on June 25, 2014 with the implantation of the vagus nerve stimulator. Panziera Mot. at 7; *see*

5   *Attmore v. Colvin*, 827 F.3d 872, 874 (9th Cir. 2016) (defining a "closed period" case as one

6   "where the ALJ finds in a single decision that the claimant was disabled for a closed period of

7   time but has since medically improved"). Specifically, Panziera argues that the ALJ failed to

8   acknowledge that Dr. Legarda, Panziera's treating neurologist, reported that Panziera suffered

9   from 2-3 seizures per week before receiving the vagus nerve stimulator. *Id.* According to

10  Panziera, this evidence shows that she met Listing 11.03 for a closed period of time. *Id.* Second,

11  Panziera argues that the ALJ erred by failing to consider whether Listing 11.03 is equaled on a

12  continuing basis, given Dr. Legarda's opinion that Panziera suffered 2-3 seizures per month after

13  receiving the vagus nerve stimulator. *Id.*

14  In the section of his written opinion addressing step three of the sequential evaluation

15  process, the ALJ did not offer any explanation of why he concluded that Panziera's impairments

16  did not meet or equal Listing 11.03. *See* AR 16. However, under the Ninth Circuit's decision in

17  *Lewis*, this failure is not fatal if the ALJ explained the evidence supporting his conclusion in

18  another section of his opinion. *See Lewis*, 236 F.3d at 513.

19  Turning first to the closed period from April 4, 2012 to June 25, 2014, the Court concludes

20  that the ALJ failed to offer any explanation for why Panziera did not meet Listing 11.03 during

21  that time period. The seizure-related evidence that the ALJ discussed in the RFC section of his

22  opinion all dealt with the period after Panziera received the vagus nerve stimulator. *See* AR 20-

23  21. The ALJ did not acknowledge Dr. Legarda's statement that Panziera suffered 2-3 seizures per

24  week before the vagus nerve stimulator, nor did the ALJ offer any other reasons why Panziera's

25  symptoms did not meet Listing 11.03 during that closed period. Under *Lewis*, this absence of

26  explanation was error.

27

28
Case No. 17-CV-02719-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

However, even when an ALJ errs, reversal is not warranted if the error is harmless. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Id.* (internal quotation marks omitted). Accordingly, "in each case [the Court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id.* Here, it is clear that the ALJ's error of failing to explain why Panziera did not meet Listing 11.03 for the closed period was harmless. First, the Listing states that the seizures must occur "more frequently than once weekly in spite of at least 3 months of prescribed treatment," 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 11.03, and that "the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment," *id.* § 11.A. *See also Lewis*, 236 F.3d at 513 (noting that a claimant's impairment does not meet the epilepsy Listing unless it persists despite adherence to treatment). However, in the instant case, it is clear from the record that Panziera's epilepsy was untreated prior to the implantation of the vagus nerve stimulator. *See* AR 634 (noting Panziera took herself off of phenobarbital when she was twenty-two years old), 636 (noting that Panziera could not tolerate anti-seizure medications), 641 (Panziera reporting to Dr. Kaczmar in May 2014 that she "is not currently taking any seizure medication").

Second, the introductory note to the neurological listings states that "[t]he reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information. Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." Here, the only description of Panziera's typical seizure pattern and postictal symptoms comes from Dr. Legarda, but Dr. Legarda did not specify whether her description was based on firsthand observation or on information from Panziera, as the Listing requires. Moreover, the ALJ acceptably discounted Dr. Legarda's opinion as unsupported by her treatment notes. As a result, the record lacks the required third-party testimony about Panziera's typical seizure pattern and postictal symptoms. Accordingly, the record would not have supported a finding that Panziera

met Listing 11.03 during the closed period. The ALJ's error in failing to explain his conclusion as to the closed period was therefore harmless.

Turning next to the ALJ's conclusion that Panziera did not meet Listing 11.03 after the implantation of the vagus nerve stimulator, the Court concludes that the ALJ's discussion of the evidence in the RFC section of the opinion adequately supports the ALJ's Listing determination. In the RFC section of his opinion, the ALJ concluded that the objective evidence does not support Panziera's allegations of the severity of her seizures. AR 20. Specifically, the ALJ found that "the medical record indicates that her last seizure was in July 2014, and her stimulator was working to prevent seizures." AR 20. The ALJ cited medical records from July 9, 2014, in which Panziera reported that she had not felt "seizur-y" since receiving the vagus nerve stimulator and from July 14, 2014, in which Panziera reported one minor seizure characterized as a dizzy spell, which Panziera cleared using the stimulator. AR 20.

The ALJ's discussion of the frequency of Panziera's seizures after the implantation of the vagus nerve stimulator sufficiently supports the ALJ's conclusion that Panziera did not meet Listing 11.03 from June 25, 2014 until the date of the ALJ's opinion. Although Panziera is correct that the ALJ appears to have overlooked medical records reflecting that she had seizures in August 2014, AR 647, and October 2014, AR 676, these oversights do not contradict the ALJ's conclusion that the vagus nerve stimulator was generally working to control Panziera's seizures. *See* AR 20. Moreover, even if the ALJ credited Dr. Legarda's opinion that Panziera's seizures occurred 2-3 times per month with the vagus nerve stimulator, such a frequency clearly fails to satisfy Listing 11.03, which required a frequency of one or more seizures per week. Accordingly, the ALJ did not err by finding that Panziera did not meet Listing 11.03 after the implantation of the nerve stimulator.

Finally, Panziera's argument that the ALJ erred by failing to evaluate whether her impairments equaled Listing 11.03 on a continuing basis also fails. First, Panziera did not at the hearing and does not now offer any theory of how her impairments equal Listing 11.03. As such,

United States District Court
Northern District of California

the ALJ was not required to address equivalence. *See Burch*, 400 F.3d at 683. Moreover, any equivalence theory would fail for the same reason that Panziera did not meet Listing 11.03 after receiving the vagus nerve stimulator—namely, that her seizures do not occur with the frequency required by Listing 11.03. *See Kennedy*, 738 F.3d at 1176 (noting that a claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment").

### 3. Improperly Discounting Opinion of Therapist Rossell

Third, Panziera asserts that the ALJ improperly discounted the opinion of therapist Nefertari Rossell. Panziera Mot. at 11. Rossell, a marriage and family therapist, had several sessions with Panziera in which Rossell took Panziera's history, recorded Panziera's current symptoms, diagnosed Panziera with severe recurrent major depressive disorder, and assigned a GAF score of 40. Rossell did not offer opinions about Panziera's residual functional capacity. The ALJ summarized some of Rossell's treatment notes in his opinion, but "accord[ed] little weight to Ms. Rossell's opinion as she is not an acceptable medical source." AR 19.

The ALJ is correct that Rossell is not an "acceptable medical source" under the Social Security regulations. *See* 20 C.F.R. § 404.1513(d)(1) (2013); *Ghanim*, 763 F.3d at 1161 ("Nurse practitioners and therapists are considered 'other sources.'"). As such, Rossell's opinion cannot establish the existence of a medically determinable impairment and is "not entitled to the same deference" as the opinion of an acceptable medical source. *Molina*, 674 F.3d at 1111; SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006), *rescinded for claims filed after March 27, 2017*, 2017 WL 3928298. However, under the regulations and SSR 06-03p, the opinions of "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p; *see also* 20 C.F.R. § 404.1513(d). These "opinions must still be evaluated," although "the ALJ may discount testimony from these other sources if the ALJ gives reasons germane to each witness for doing so." *Ghanim*, 763 F.3d at 1161 (internal quotation marks omitted).

Here, the only reason that the ALJ gave for discounting Rossell's opinion is that Rossell is

United States District Court
Northern District of California

not an acceptable medical source. The Ninth Circuit considered the same issue in *Haagenson v. Colvin*, 656 F. App'x 800 (9th Cir. 2016) (unpublished). In *Haagenson*, the ALJ rejected the opinions of a nurse and a counselor, both of whom are "other sources." The only reason that the ALJ gave for rejecting these opinions was that the sources were "not acceptable medical sources within the meaning of the federal regulation." *Id.* at 802 (internal quotation marks omitted). The Ninth Circuit held that this was not a germane reason because "the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources.'" *Id.* Similarly, in the instant case, because the regulations require the ALJ to consider opinions from other sources, the fact that Rossell is not an acceptable medical source is not a germane reason to disregard her opinion. Accordingly, the ALJ erred by discounting Rossell's opinion. The Court considers whether this error was harmless in Section III.C.8, below.

### 4. Adopting Only Part of Consultative Examiners' Opinions

Fourth, Panziera contends that the ALJ erred by purporting to give "great weight" to the opinions of consultative examiners Dr. Manuel Hernandez and Dr. Pauline Bonilla but failing to adopt significant parts of their opinions when determining Panziera's RFC. Panziera Mot. at 11-12. This alleged error could be framed either as a failure to provide sufficient reasons for rejecting parts of an examining physician's opinion or as a failure to incorporate all relevant limitations into the RFC. *See Scott v. Colvin*, No. 14-cv-4051-EDL, 2015 WL 11438598, at *7 (N.D. Cal. Dec. 9, 2015) ("Plaintiff argues that the ALJ erred by failing to either discredit these finding[s] or incorporate them into the RFC assessment.") To reject an examining physician's contradicted opinion, the ALJ must provide "specific and legitimate reasons that are supported by substantial evidence." *Ryan*, 528 F.3d at 1198 (quoting *Bayliss*, 427 F.3d at 1216). "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r, Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

United States District Court
Northern District of California

### a. Examining Physician Dr. Hernandez

The ALJ gave great weight to Dr. Hernandez's opinion about Panziera's physical limitations because Dr. Hernandez "supported his opinion with clinical findings from his examination of the claimant" and because Dr. Hernandez "is board-eligible in internal medicine, and his training provides him with knowledge and a perspective not shared by other physicians of record." AR 22. However, the ALJ rejected Dr. Hernandez's opinion that Panziera could lift or carry 20 pounds occasionally and 10 pounds frequently and that Panziera could stand or walk for only about two hours per day. *Id.* The ALJ reasoned that Dr. Hernandez's clinical findings did not support these limitations because Dr. Hernandez found no abnormalities in Panziera's legs, arms, or back. *Id.* The ALJ also stated that treatment notes from other physicians were inconsistent with these limitations. The ALJ rejected without comment Dr. Hernandez's opinion that Panziera should avoid odors, extremes of temperature, stress, and any magnetic devices due to her epilepsy. *See* AR 17 (only epilepsy-related limitations included in RFC were prohibitions against working around heights or machinery), AR 650 (Dr. Hernandez's opinion). The ALJ did not offer any explanation for rejecting these epilepsy-related limitations assigned by Dr. Hernandez.

As explained in Section III.C.1., above, "an ALJ may discredit [examining] physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Batson*, 359 F.3d at 1195 (internal citations omitted). Thus, the ALJ did not err by rejecting Dr. Hernandez's lift/carry and stand/walk restrictions as unsupported by his clinical findings and inconsistent with the record. However, an ALJ who divides a physician's opinion into multiple parts and finds that only part of that opinion is inconsistent with the record may not discredit the entire opinion as a result of that limited inconsistency. *See generally Dale v. Colvin*, 823 F.3d 941, 945 (9th Cir. 2016) ("We now hold that an ALJ errs when he discounts an other source's *entire* testimony because of inconsistency with evidence in the record, when the ALJ has divided the testimony into distinct parts and determined that only one part of the

35

testimony is inconsistent."). Indeed, here, the ALJ did not purport to discredit all of Dr. Hernandez's opinion. Instead, the ALJ stated that he gave Dr. Hernandez's opinion great weight, with the exception of Dr. Hernandez's lift/carry and stand/walk limitations. Thus, the ALJ erred in addressing the epilepsy-based limitations in Dr. Hernandez's opinion, either because the ALJ failed to offer a specific, legitimate reason supported by substantial evidence for rejecting these limitations or because the ALJ assigned an RFC that did not include these limitations. The Court addresses whether this error was harmless in Section III.C.8., below.

### b. Examining Psychologist Dr. Bonilla

The ALJ afforded Dr. Bonilla's opinion great weight because Dr. Bonilla based her opinion on the clinical findings from her examination of Panziera and because Dr. Bonilla's training as a licensed psychologist gave her a perspective not shared by other physicians of record. AR 19. Based on Dr. Bonilla's opinion, the ALJ found that Panziera's "moderate limitation in maintaining concentration, persistence or pace limits [Panziera] [to] simple and repetitive tasks." AR 19. Panziera argues that the ALJ erred by failing to incorporate the other limitations in Dr. Bonilla's opinion into the RFC. Panziera Mot. at 12. Specifically, Dr. Bonilla opined that Panziera's ability to interact with coworkers and the public, maintain regular attendance, complete a normal workday/workweek, deal with stress, and maintain emotional stability were limited to some degree. According to Panziera, a limitation to simple, repetitive tasks does not properly account for these social- and attendance-related limitations. *Id.* Relying mainly on *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008), the Commissioner argues that the limitation to simple, repetitive tasks adequately accounts for all of Panziera's mental impairments. Comm'r Mot. at 6.

In *Stubbs-Danielson*, one physician assessed that the claimant had a slow pace in thinking and actions and assessed that the claimant was moderately limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. 539 F.3d at 1173. The physician also assessed that the claimant was mildly limited in several other mental

36

functioning areas related to attention, concentration, and adaptation. *Id.* at 1173-74. Another physician identified similar limitations but opined that the claimant remained capable of performing simple, repetitive tasks. *Id.* The Ninth Circuit held that the ALJ did not err by "translat[ing] [the claimant]'s condition, including the pace and mental limitations, into the only concrete restrictions available to him—[the second physician]'s recommended restriction to 'simple tasks.'" *Id.* at 1174. The Ninth Circuit also reasoned that the RFC was consistent with the restrictions identified in the first physician's opinion. *Id.*

However, the Ninth Circuit and district courts in the Ninth Circuit have held that *Stubbs-Danielson* does not control in cases where the limitations relate to functional areas other than concentration, persistence, and pace, such as social functioning and attendance. *See Bagby v. Comm'r of Soc. Sec.*, 606 F. App'x 888, 890 (9th Cir. 2015) (unpublished) (holding that RFC limiting claimant to simple, repetitive tasks, no public contact, and occasional interaction with coworkers did not account for a limitation in responding appropriately to changes in a routine work setting); *Betts v. Colvin*, 531 F. App'x 799, 800 & n.1 (9th Cir. 2013) (unpublished) (distinguishing *Stubbs-Danielson* and holding that ALJ erred by affording "greatest weight" to medical opinion but disregarding aspects of that opinion including limitations on attendance, among other areas); *Markell v. Berryhill*, No. 17-cv-792-MEJ, 2017 WL 6316825 at *7-8 (N.D. Cal. Dec. 11, 2017) (holding that RFC limiting claimant to simple, repetitive tasks accounted for moderate impairment in concentration, persistence, and pace, but did not account for limitations in attendance or ability to interact with supervisors); *Scott*, 2015 WL 11438598, at *7 ("While the ALJ's RFC here may adequately account for Plaintiff's moderate difficulty in concentrating and focusing on sustained, productive work, [*Stubbs-Danielson*] does not hold that a limitation o simple, routine work accounts for difficulties in maintaining attendance and with communicating in the workplace."); *Olmedo v. Colvin*, No. 1:14-cv-621-SMS, 2015 WL 3448093, at *8-9 (E.D. Cal. May 28, 2015) (holding that RFC limiting claimant to simple, repetitive tasks with no public contact did not account for limitations in maintaining attendance and completing a normal

37

workday or workweek, among others); *Shea v. Astrue*, No. ED CV 12-86-E, 2012 WL 12878360, at *1-2 (C.D. Cal. Aug. 10, 2012) (holding that RFC limiting claimant to simple, repetitive tasks with no public contact did not account for limitations in social interaction or attendance).

Similarly, here, the Court finds that while the ALJ's RFC may adequately account for Panziera's moderate difficulty in maintaining concentration, persistence, and pace, the RFC does not account for the social- and attendance-related limitations in Dr. Bonilla's opinion. *See Scott*, 2015 WL 11438598 at *7. Because the ALJ afforded great weight to Dr. Bonilla's opinion but did give any reasons for rejecting these limitations or incorporate them into the RFC, the ALJ erred. *See id.* at *8 ("Here, it is unclear whether the ALJ rejected Dr. Johnson's opinion or believed that her RFC finding adequately accounted for the limitations assessed by Dr. Johnson. Either way, the ALJ erred."). The Court addresses whether this error was harmless in Section III.C.8., below.

### 5. Improperly Discounting Dr. Giallo's Opinion

Examining psychologist Dr. Giallo noted in January 2013 that Panziera was sad, sullen, and cried throughout the interview. AR 354. Panziera's Beck Depression Inventory score indicated severe depression. *Id.* Dr. Giallo diagnosed Panziera with depressive disorder and generalized anxiety disorder and opined that Panziera "is in need of ongoing psychotherapy and medication monitoring." *Id.* In addition, Dr. Giallo opined that Panziera "currently is too emotionally distraught to perform any work duties." *Id.* The ALJ gave no weight to Dr. Giallo's opinion that Panziera is unable to work because the ultimate issue of disability is a medical-vocational determination reserved for the Commissioner. AR 19. Panziera argues that this is not a sufficient reason to disregard an examining psychologist's entire opinion.

The ALJ is correct that the "final responsibility for deciding certain issues, such as whether an individual is disabled under the Act, is reserved to the Commissioner." SSR 06-03p, 2006 WL 2263437 (citing 20 C.F.R. § 404.1527). However, under Ninth Circuit precedent, "an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim*, 763 F.3d at 1161. Instead, "[i]f the treating physician's opinion on the issue of disability is

controverted, the ALJ must still provide 'specific and legitimate' reasons in order to reject the treating physician's opinion." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); *accord Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir.1993) (Although the ALJ "is not bound by the uncontroverted opinions of the claimant's physicians on the ultimate issue of disability, . . . he cannot reject them without presenting clear and convincing reasons for doing so." (internal quotation marks omitted)). The same principle applies to examining physicians. *See Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012).

Panziera argues that her case is similar to *Hill*, 698 F.3d 1153. In *Hill*, an examining psychologist opined that the claimant's "combination of mental and medical problems makes the likelihood of sustained full time competitive employment unlikely." *Id.* at 1159. The ALJ in *Hill* did not mention the examining psychologist's opinion. *Id.* at 1160. The Commissioner conceded that the ALJ did not mention the examining psychologist's opinion but argued that this error was harmless because the ultimate issue of disability is reserved to the Commissioner. *Id.* The Ninth Circuit disagreed. The Ninth Circuit reasoned that the examining psychologist's statement that the claimant "would be 'unlikely' to work full time was not a conclusory statement like those described in 20 C.F.R. § 404.1527(d)(1), but instead an assessment, based on objective medical evidence, of [the claimant's] *likelihood* of being able to sustain full time employment given the many medical and mental impairments [the claimant] faces and her inability to afford treatment for those conditions." *Id.* (emphasis in original). As such, the Ninth Circuit held that the error was not harmless.

Like the examining psychologist's opinion in *Hill*, Dr. Giallo's opinion in the instant case was "not a conclusory statement like those described in 20 C.F.R. § 404.1527(d)(1)" that Panziera is disabled. 698 F.3d at 1160. Indeed, Dr. Giallo did not purport to opine on the ultimate issue of disability under the Act—as the Commissioner points out, Dr. Giallo only opined that Panziera was currently too emotionally distraught to perform work tasks. Dr. Giallo did not opine on how long Panziera had been unable to work, nor did Dr. Giallo project whether Panziera's condition

39

would improve.  Rather, Dr. Giallo's opinion in the instant case was "an assessment, based on objective medical evidence"—here, the clinical interview and the results of the Beck Depression Inventory—of Panziera's ability to function at work as of January 2013.  *Id.*  Accordingly, under *Hill*, *Ghanim*, *Holohan*, and *Matthews*, the ALJ erred by disregarding Dr. Giallo's opinion without offering a specific and legitimate reason supported by substantial evidence for doing so.  The Court assesses whether this error was harmless in Section III.C.8., below.

### 6. Improperly Discounting Panziera's Testimony

Sixth, Panziera argues that the ALJ improperly discounted Panziera's subjective symptom testimony.  Panziera Mot. at 14.  "An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible."  *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014).  At the first step, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.  *Id.*  At the second step, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.* at 1014-15 (quoting *Smolen*, 80 F.3d at 1281).  "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'"  *Id.* at 1015 (quoting *Moore v. Comm'r of Soc. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"[B]ecause the claimant's subjective statements may tell of greater limitations than can medical evidence alone," "the ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001); *see also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("While an ALJ may find testimony not credible in part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective medical evidence."); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989) ("That a claimant testifies that his symptom is more disabling than would normally be expected gives no valid reason to discount his

40

Case No. 17-CV-02719-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

testimony."). Thus, the fact that objective medical evidence does not support the full extent of a claimant's alleged symptoms is not a clear and convincing reason to discount the claimant's testimony. However, "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008).

In the instant case, the ALJ found that Panziera's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Panziera's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." AR 23. Specifically, the ALJ wrote that "[t]here is some question as to the claimant's credibility with regard to the issue of her alleged functional limitations due to various inconsistencies in the record; in particular, Dr. Bonilla's evaluation of the claimant indicates that the claimant's symptoms are not as severe as the claimant alleges."[1] AR 19. The ALJ also found that Panziera's "allegations of the severity of her seizures is not supported by the objective evidence," AR 20, and that Panziera's "allegation[] of low back pain is partially supported by the record," AR 21.

Because the ALJ frames the seizure and low back pain severity issues as whether Panziera's claims are supported by the objective evidence or the record, the rule from *Tonapetyan*, *Robbins*, and *Swenson* would appear to govern. Under this rule, the ALJ would have erred if the only reason he offered for discrediting Panziera's testimony is that the objective medical evidence does not support the full extent of Panziera's claimed symptoms. However, the ALJ's reasoning also highlights inconsistencies between Panziera's claimed symptoms and how Panziera described the symptoms to her doctors. For example, Panziera claimed in her hearing testimony that she suffered 3-6 seizures per week during the previous two years, AR 41, but the ALJ pointed out that

---

[1] It is not clear what effect on the instant analysis, if any, the ALJ's rejection of some of the limitations assessed by Dr. Bonilla has. In other words, can an ALJ discredit a claimant's testimony because it conflicts with a doctor's opinion if the ALJ does not fully credit that doctor's opinion? The Court need not resolve this issue because the ALJ identified other inconsistencies in the record that support his credibility determination.

Panziera reported three weeks after receiving the vagus nerve stimulator that she had only experienced one minor seizure, which she "cleared with use of the stimulator." AR 20.

Similarly, Panziera alleged in filings with the Social Security Administration that she had tailbone pain that radiated to her calves. AR 21-22, 286. Panziera told some doctors that the radiating pain was constant, AR 680, 698, but told other doctors that the pain was intermittent, AR 614, and told other doctors that she did not have pain that radiated into her legs, AR 647. Under *Carmickle*, such inconsistencies constitute a clear and convincing reason to discredit Panziera's subjective symptom testimony. 533 F.3d at 1161.

### 7. Failing to Pose a Complete Hypothetical to the VE

Finally, Panziera asserts that the ALJ failed to pose a complete hypothetical to the VE who testified at the hearing. Panziera Mot. at 15. "If a vocational expert's hypothetical does not reflect all the claimant's limitations, then the 'expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.'" *Matthews*, 10 F.3d at 681 (quoting *DeLorme v. Sullivan,* 924 F.2d 841, 850 (9th Cir.1991)). Specifically, Panziera argues that the ALJ did not ask the VE any hypothetical questions using the RFC he actually assigned, which was based on medium work. *Id.* Rather, the ALJ only asked about an RFC featuring light work. In addition, Panziera argues that the ALJ erred by failing to confirm that the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). *Id.*

Here, although the ALJ took testimony from a VE at the hearing, the ALJ did not rely on that testimony in his written decision. Rather, the ALJ relied on the Grids to find Panziera not disabled. As a result, any error in questioning the VE at the hearing was harmless because the ALJ did not rely on the VE's testimony.

### 8. Harmless Error

As explained above, even when an ALJ errs, reversal is not warranted if the error is harmless. *Molina*, 674 F.3d at 1115. An error is harmless "where it is inconsequential to the ultimate nondisability determination." *Id.* (internal quotation marks omitted). Accordingly, "in

each case [the Court] look[s] at the record as a whole to determine whether the error alters the outcome of the case." *Id.* The Court already determined that the ALJ's failure to provide sufficient reasons for finding that Panziera did not meet Listing 11.03 for the closed period was harmless because the record evidence shows that she did not meet the Listing for that period. The Court also determined that any error in questioning the VE was harmless because the ALJ did not rely on the VE's testimony in his written decision.

The Court now addresses whether the ALJ's errors in handling the opinions of examining therapist Ms. Rossell, examining physician Dr. Hernandez, examining psychologist Dr. Bonilla, and examining psychologist Dr. Giallo were harmless. The opinions of Dr. Hernandez and Dr. Bonilla included environmental-, social-, and attendance-based limitations that the ALJ did not include in the RFC. In addition, the opinions of Ms. Rossell and Dr. Giallo contain evidence about the severity of Panziera's depression that could affect how the ALJ evaluates the limitations in Dr. Bonilla's opinion. Because the record does not contain any evidence about the effect that including one or more of these limitations in the RFC would have on the disability determination, the Court cannot conclude that these errors were "inconsequential to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115. As a result, the Court concludes that these errors were not harmless.

### 9. Remand for Further Proceedings is Appropriate

Panziera urges the Court to remand to the Commissioner for an award of benefits. Panziera Mot. at 16. "When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 847 F.3d 1130, 1133 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). However, the Ninth Circuit has developed a three-step analysis, sometimes called the "credit-as-true rule," for determining when a remand for an award of benefits is appropriate. *See id.* First, the Court asks whether the "ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion."

*Treichler*, 775 F.3d at 1100-01 (quoting *Garrison*, 759 F.3d at 1020).  Second, the Court determines "whether the record has been fully developed, whether there are outstanding issues that must be resolved before a determination of disability can be made, and whether further administrative proceedings would be useful."  *Id.* at 1101 (internal quotation marks and citations omitted).  "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."  *Id.*  Third, if the Court concludes that no outstanding issues remain and further proceedings would not be useful, the Court may exercise its discretion to credit the relevant testimony as true and remand for an award of benefits. *Id.*

Here, the first step of the credit-as-true rule is satisfied because the ALJ failed to provide legally sufficient reasons for rejecting medical opinion and "other source" evidence.  *See Treichler*, 775 F.3d at 1100-01.  However, the second step is not satisfied.  Several outstanding issues must be resolved before a disability determination can be made, including whether the ALJ's RFC must change in light of the errors identified in this Order.  If so, additional testimony from a VE about the availability of jobs for the new RFC will likely be necessary.  Further proceedings would likely be useful in resolving these issues.  As such, the second step of the credit-as-true rule is not satisfied, and so remand for further proceedings is appropriate.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Panziera's motion for summary judgment and DENIES the Commissioner's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: January 3, 2018

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

44

Case No. 17-CV-02719-LHK
ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT